1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

JOHN HENRY JONES, an individual,

Plaintiff,

v.

KING COUNTY METRO TRANSIT,

Defendant.

C07-319Z

ORDER

14

15      THIS MATTER comes before the Court on two motions for partial summary

16  judgment brought by defendant King County Metro Transit ("Metro").  By Minute Order

17  dated June 10, 2008, docket no. 161, the Court granted plaintiff's request pursuant to Fed.

18  R. Civ. P. 56(f) for a continuance of Metro's motions for partial summary judgment,[1] and

19  established a schedule for the filing of a supplemental response and a supplemental expert

20  report.  Plaintiff did not submit the permitted documents by June 19, 2008, as required by the

21  Court's Minute Order.  Having not received any additional papers from plaintiff by the

22  deadline, the Court approved for entry a Minute Order granting Metro's motion for partial

23  summary judgment regarding plaintiff's disparate impact claim, docket no. 94, and granting

24

25

26

---

[1] Plaintiff made continuance requests in his response brief, _see_ docket no. 125 at 6 & n.2, in a document that was not properly noted as a motion, docket no. 137, and by motion filed after briefing on the partial summary judgment motions had been completed, _see_ docket no. 157.  Plaintiff has now had ample time and opportunity to respond to Metro's pending motions, and the matter is ripe for the Court's review.

ORDER - 1

in part and denying in part Metro's motion for partial summary judgment regarding plaintiff's remaining claims, docket no. 105.  *See* Minute Order dated June 24, 2008 (docket no. 167).  After the Court approved the referenced Minute Order for entry but before it was docketed, plaintiff filed an untimely supplemental response brief and four declarations, including an amended declaration of plaintiff's expert, Barry Knake.  These late materials, which consist of 131 pages (working copies of which counsel did not provide to the Court), far exceed the length allowed by the Court's Minute Order, which was 15 pages including exhibits, attachments, and appendices, and further violate the Court's Minute Order by containing "additional affidavits or declarations," which plaintiff was explicitly prohibited from filing.  Moreover, the supplemental response brief does not reference any new evidence or statistical analysis associated with post-disciplinary grievances filed under the collective bargaining agreement between Metro and the Amalgamated Transit Union Local 587 ("ATU"), which was the basis of plaintiff's formal motion for a Rule 56(f) continuance.

Although the supplemental response brief contains nothing more than rehash of arguments already made, the Court has considered it, along with the overlength amended declaration of Barry Knake and the inappropriately filed declarations of Lance Norton, Roger Knight, and Judith Calhoun.  Having considered all papers filed in support of and in opposition to Metro's motions for partial summary judgment, the Court hereby:

(1)     DENIES Metro's motions, docket nos. 129 and 144, to strike plaintiff's response briefs;

(2)     GRANTS Metro's motion for partial summary judgment regarding plaintiff's disparate impact claim, docket no. 94;

(3)     GRANTS IN PART and DENIES IN PART Metro's motion for partial summary judgment regarding plaintiff's remaining claims, docket no. 105;

(4)     DISMISSES with prejudice plaintiff's claims for disparate impact and hostile work environment under federal and state law, as well as plaintiff's claims for disparate

1   treatment and/or retaliation based on discrete acts occurring before the relevant statute of

2   limitations date under federal and state law;

3       (5)   DISMISSES with prejudice plaintiff's disparate treatment and/or retaliation

4   claims under federal and state law based on any allegedly adverse employment action other

5   than plaintiff's thirty-day suspension and termination;

6       (6)   GRANTS Metro's motion in limine to exclude the testimony of Barry Knake,

7   and RENOTES Metro's remaining motions in limine, docket no. 134, to the date of the

8   Pretrial Conference, September 3, 2008; and

9       (7)   DIRECTS the Clerk to send copies of this Order to all counsel of record.

10  **Background**

11      Plaintiff John Henry Jones was employed by Metro as a "transit operator" from

12  September 1980 until July 2007.  Jones Decl. at 1 (docket no. 119); Notice of Suspension

13  and Termination, Exh. 2 to Zeldenrust Decl. (docket no. 95).  During the course of his tenure

14  with Metro, Jones was both the complainer and the subject of complaint on a number of

15  occasions.  On October 10, 2000, fellow transit operator Deborah Brice complained that

16  Jones, while driving a Metro vehicle, pursued her and her daughter out of a Metro base at a

17  very high rate of speed.  _See_ Exh. A to Jolly Decl. (docket no. 147).  Ms. Brice also alleged

18  that Jones had previously used Metro's internal mail system to send her a letter containing

19  pornographic material.  _Id._  On October 12, 2000, Ms. Brice confronted Jones by asking him

20  why he "insisted on acting like a little boy chasing my daughter through a parking lot and up

21  a freeway ramp."  _See_ Exh. A to Teply Decl. (docket no. 150).  On October 14, 2000, Jones

22  filed a complaint accusing Ms. Brice of using a racial slur ("boy") and of insinuating that he

23  is a pedophile, thereby sexually harassing him and creating a hostile work environment.  _See_

24  Exh. A to Teply Decl.  After investigation, Metro management determined that the various

25  allegations could not be substantiated, and no discipline was imposed.  _See_ Exh. A to Jolly

26  Decl.; Exh. A to Teply Decl.  Jones, however, was warned not to contact Ms. Brice in the

1   workplace except for work-related reasons and not to use Metro property or facilities for

2   private or inappropriate purposes.  Exh. A to Jolly Decl.  Ms. Brice was counseled against

3   the use of the term "boy" and was directed to avoid having contact with Jones.  Exh. A to

4   Teply Decl.

5        In April 2002, Ms. Brice and Jones were involved in another incident concerning

6   which they gave contradictory accounts.  Ms. Brice alleged that Jones shoved her while she

7   was standing at a counter; Jones asserted that he returned to a counter at which he had been

8   working to find Ms. Brice standing over his paperwork, that she began arguing with him

9   when he told her he was working in that location, and that she shoved him.  Exh. A to Teply

10  Decl. (docket no. 150).  Base Chief Mary Collins was unable to determine who initiated the

11  shoving, but she reminded each individual of the previous directive not to have contact.  _Id._

12  Apparently, no discipline was imposed.

13       In July 2002, fellow transit operator Laurie Beatty complained about comments Jones

14  made concerning Ms. Brice and about a letter Jones sent through Metro's internal mail

15  system asking her "to be his safe-sex partner."  Beatty Dep. at 12:24-13:19, Exh. 1 to

16  Zeldenrust Decl. (docket no. 95); _see_ Exh. A to Teply Decl. (docket no. 150).  According to

17  Ms. Beatty, Jones began making inappropriate sexual comments to her in 1986, and he did so

18  continuously after that time.  Beatty Dep. at 10:7-11:11.  Ms. Beatty informed Metro

19  management about the two incidents in 2002, and about an incident in 2007, which will be

20  further discussed below, but otherwise did not complain about Jones based on her view that

21  management "failed to act."  _Id._ at 12:4-9.

22       Also in July 2002, in the presence of Base Chief Collins, Jones confronted a mechanic

23  for calling him a derogatory name (apparently, "nigger").  Exh. A to Teply Decl. (docket

24  no. 150); _see_ Jones Decl. at 2 (docket no. 119).  The mechanic admitted using the

25  inappropriate language and apologized.  Exh. A to Teply Decl.  Base Chief Collins

26

counseled the mechanic against use of the racial slur and documented the incident in the mechanic's personnel file.  *Id.*

On September 23, 2002, Jones tested positive for drug use on a random urinalysis, and he was suspended for five days.  Wamsley Decl. at ¶¶ 4-5 & Exh. A (docket no. 114).

In January 2003, a developmentally delayed juvenile customer complained that Jones, while operating a Route 66 coach en route to Northgate, asked "a series of personal questions, some of which included specific references to vulgar, sexual situations," thereby making the juvenile uncomfortable.  Exh. B to Jolly Decl. (docket no. 147).  After investigation, Metro management found that the "available information is insufficient to conclude that [Jones] asked the [alleged] questions," and no discipline was imposed.  *Id.*  Jones, however, was advised that "negative, sexually oriented, vulgar language . . . [is] not acceptable" and might result in disciplinary action.  *Id.*

In May 2003, Jones reported that someone poured coffee on the front hood of his vehicle.[2]  Wamsley Decl. at ¶ 2 & Exh. A (docket no. 115).  In December 2003, Metro District Supervisor Evan Watkins "chalked" the tires of Jones's vehicle because it had been parked in the same spot at the North Base lot for three consecutive Saturdays.  Watkins Decl. at ¶ 2 (docket no. 116).  Supervisor Watkins marked the tires to determine whether the vehicle was improperly parking overnight.  *Id.* at ¶ 3.  When he did so, he did not know the vehicle belonged to Jones.  *Id.*  Jones asserts that the chalk was difficult to remove and that other cars were not subject to the same treatment, but were instead allowed to remain parked for weeks or were simply tagged with a note on the windshield.  Jones Decl. at 2-3 (docket no. 119).  Jones, however, does not dispute that, when Supervisor Watkins chalked the tires, he had no idea Jones owned the vehicle.

---

[2] Jones's vehicle was apparently vandalized both before and after the coffee incident, *see* Jones Decl. at 2 (docket no. 119), but Jones has presented no evidence concerning the identity of the vandal(s) or any racial or retaliatory motive for the damage.

1    In September 2004, due to the manner in which First Line Supervisor John Obourn

2    assigned work on a particular day, Jones was required to split his shift, resulting in fewer

3    than a full day's worth of work.  Obourn Decl. (docket no. 112).  Supervisor Obourn's intent

4    had been to avoid splitting Jones's shift, thereby maximizing Jones's hours for the day, but

5    due to unusual circumstances, no midday routes were available and Jones had no work for a

6    portion of his 13-hour shift.  *Id.* at ¶ 4.  The union filed a grievance on Jones's behalf, and he

7    was subsequently compensated for the loss in wages attributed to the way in which

8    Supervisor Obourn assigned work on the day in question.  *Id.* at ¶ 5.

9    In February 2005, Jones again complained about Ms. Brice, alleging sexual

10   harassment.  Exh. C to Jolly Decl. (docket no. 147).  His complaint involved an incident

11   occurring on December 23, 2004, concerning which the parties have provided no substantive

12   information.  In February 2005, Base Chief Lauri Camara indicated by letter to Jones that an

13   investigation regarding the December 2004 incident produced inconclusive results due to the

14   lack of witness corroboration.  *Id.*  Base Chief Camara reminded Jones about the previous

15   "no contact" instruction, and reiterated that Ms. Brice's actions toward him did not constitute

16   harassment.  *Id.*  Base Chief Camara also indicated that, although Jones had used a term

17   "reasonably construed as offensive," his conduct likewise did not rise to the level of sexual

18   harassment.  *Id.*  No further action was taken.

19   On April 3, 2005, First Line Supervisor Joshua Shields wrote a performance report

20   indicating that he observed Jones, while operating a Route 41 coach, arrive at a stop three

21   minutes ahead of schedule and then continue "without holding for schedule," in violation of

22   Metro's policies and procedures.  Exh. A to Shields Decl. (docket no. 113).  The

23   performance report was subsequently issued to Jones by Base Chief Jeff Wamsley.  Exh. B

24   to Wamsley Decl. (docket no. 114).

25   On December 1, 2005, First Line Supervisor Eric Brumbach wrote a performance

26   report indicating that Jones, while operating a Route 66 coach, arrived at a stop 2½ minutes

ORDER  - 6

early.  Exh. A to Brumbach Decl. (docket no. 106).  Supervisor Brumbach noted that Jones held for schedule, but was counseled not to arrive more than two minutes early at a scheduled time point location or to arrive early more than once within two minutes.  *Id.* Jones stated that he would comply with these instructions.  *Id.*  In a declaration filed in connection with the pending motions, Supervisor Brumbach explained that, when he conducts daily time checks, he always makes himself noticeable to the approaching operator so that his purpose is clear.  Brumbach Decl. at ¶ 4.  In addition, Supervisor Brumbach estimated that, at times, he might write three to four performance reports per day for early operation, while at other times, he might not write any performance reports for a period of two to three weeks because all transit operators are in compliance.  *Id.* at ¶ 3.  Jones was apparently suspended for two days as a result of Supervisor Brumbach's performance report. *See* Amended Complaint at ¶ 11 (docket no. 21).

On March 30, 2006, Supervisor Shields wrote two performance reports, one indicating that Jones, while operating a Route 66 coach, displayed the incorrect sign ("66 to Ferry Terminal" rather than "66 to Northgate via Eastlake"), and one recounting a confrontation between Jones and a passenger during which Jones pushed the passenger. Exhs. B & C to Shields Decl. (docket no. 113).

In November 2006, fellow transit operator Richard Jensen complained that Jones was harassing him.  Keyport Decl. at ¶ 4 & Exh.  Mr. Jensen alleged that, in four separate incidents occurring between September and November 2006, Jones attempted to bate or bully him, either verbally or physically.  *Id.*  After investigation, Base Chief Suzanne Keyport concluded that the claim of harassment was not substantiated, but that Jones acted in a rude and inappropriate manner toward Mr. Jensen.  *Id.*  Base Chief Keyport issued a directive to Jones to refrain from future contact with Mr. Jensen unless business necessity required such interaction.  *Id.*  Mr. Jensen was likewise directed to stay away from Jones.  *Id.*

On December 1, 2006, while operating a Route 331 coach, Jones was involved in an accident.  Craig Decl. at ¶¶ 2 & 3 (docket no. 108).  Via radio, Jones informed First Line Supervisor Jeffrey Craig, who was then working in the Metro control center, that he did not have an "accident kit" with him.  *Id.* at ¶ 4.  An "accident kit" contains Metro's proof of insurance form to be provided to the other parties involved in a collision.  *Id.*  Supervisor Craig attempted to locate a supervisor who could respond to the scene, but all three possibilities were located some distance away and none of them could get to the scene quickly.  *Id.* at ¶ 5.  After directing the District 32 supervisor to travel from North Base to the scene, Supervisor Craig contacted the Seattle Police Department ("SPD") to request assistance.  *Id.* at ¶ 6.  In the exchange with SPD, Supervisor Craig indicated that he was certain the accident did not involve injuries, but he did not know whether the vehicles were blocking the roadway.  *Id.* at Exh. 1 at 5:1-7.  After arriving at the scene, SPD issued Jones a traffic citation for "inattention to duty."  *Id.* at Exh. 1 at 6:8-10.  According to Supervisor Craig, although he had issued three performance reports for Jones, two of which he had written in 2001 and 2003, respectively, and one of which he had merely stamped in his capacity as Acting Control Center Chief, at the time he was handling the accident at issue, he did not recall exactly who John Jones was (or, presumably, his race).  *Id.* at ¶¶ 7 & 8.

On January 22, 2007, Jones filed this action in King County Superior Court.  On March 2, 2007, Metro filed a Notice of Removal to this Court.  On April 27, 2007, Laurie Beatty made her third complaint against Jones, alleging that he struck her in the back of the head.  Beatty Dep. at 13:20-25, Exh. 1 to Zeldenrust Decl. (docket no. 95); Notice of Suspension and Termination, Exh. 2 to Zeldenrust Decl.  After investigation, Base Chief Lauri Camara concluded that Ms. Beatty's allegation was true.[3]  Exh. 2 to Zeldenrust Decl.

---

[3] The basis for this finding was apparently explained in a pre-disciplinary letter dated June 13, 2007, which has not been provided to the Court.  *See* Exh. 2 to Zeldenrust Decl.  The decision to terminate Jones, however, was not made by Base Chief Camara, but rather by her superior, Base Supervisor Dave Jolly.  *See* Camara Decl. at ¶ 4 (docket no. 107).  According to Base Supervisor Jolly, in reaching his decision, he considered the statements of witnesses who observed Laurie Beatty on the day in question, the statement of a witness who

ORDER  - 8

1    On June 22, 2007, Jones was notified that he was being suspended for thirty days without

2    pay, effective June 23, 2007, and terminated for gross misconduct, effective July 24, 2007.

3    *Id.*

4        According to Transit Labor and Employee Relations Supervisor and Service Delivery

5    Manager Laird Cusack, pursuant to the Contract between ATU and Metro (the "ATU

6    Contract"), disciplinary infractions are divided into three classes:  Minor, Serious, and

7    Major.  Cusack Decl. at ¶¶ 3 & 4 (docket no. 130).  Under the ATU Contract, Metro imposes

8    progressive, non-discretionary, discipline for Minor infractions.  *Id.* at ¶ 5.  Serious

9    infractions may be punished, on a discretionary basis, by suspension for up to five days.  *Id.*

10   at ¶ 6.  Major infractions are segregated into non-discretionary and discretionary violations.

11   *Id.* at ¶ 7.  Non-discretionary Major infractions include violation of the anti-drug policy,

12   accumulation of unexcused absences, and exceeding accident points.  *Id.* at ¶ 8.  Metro's

13   anti-drug policy incorporates a two-strike system, and employees are always fired on the

14   second strike.  *Id.*  Non-discretionary discharges account for 70% to 85% of all disciplinary

15   terminations in any given year.  *Id.* at ¶ 9.

16       Discretionary Major infractions include gross misconduct and insubordination.  *See*

17   *id.* at ¶ 10.  The basis for Jones's termination qualifies as a discretionary Major infraction.

18   *See* Cusack Decl. at ¶ 4 (docket no. 99).  Although the default discipline for a Major

19   infraction is discharge, for gross misconduct like in Jones's case, Metro's management has

20   discretion to consider suspension rather than termination.  Cusack Decl. at ¶¶ 7 & 10 (docket

21   no. 130).

22

23

24

25   ————————————

26   heard Ms. Beatty exclaim immediately after Jones allegedly struck her, and a medical report from Ms. Beatty's
     physician.  Jolly Decl. at ¶ 4 (docket no. 110).  At the time he decided to terminate Jones, Base Supervisor Jolly
     was aware that Jones had filed this lawsuit.  *Id.* at ¶ 5.

ORDER  - 9

**Discussion:**

**A.      Motion to Strike**

Plaintiff's counsel has submitted a large volume of materials without appropriate citations thereto or explanation thereof in his briefs.  Metro has moved to strike both of plaintiff's responses on this basis, as well as the untimeliness of the briefs.  *See* Reply (docket no. 129); Reply (docket no. 144).  Although the lack of adequate citation certainly provides grounds for the Court to ignore most of the mountain of papers that plaintiff has filed, *see Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found."), the deficiency alone does not justify striking the response briefs.  Moreover, although the initial responses were untimely, they were only one day late and Metro was able to file its reply briefs on time, without any extension.  Thus, the Court DENIES Metro's requests to strike plaintiff's response briefs.

**B.      Summary Judgment Standard**

The Court must grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In support of its motion for summary judgment, the moving party need not negate the opponent's claim, *Celotex*, 477 U.S. at 323; rather, the moving party will be entitled to judgment if the evidence is not sufficient for a jury to return a verdict in favor of the opponent, *Anderson*, 477 U.S. at 249.

When a properly supported motion for summary judgment has been presented, the adverse party "may not rely merely on allegations or denials" in its pleadings.  Fed. R. Civ.

P. 56(e).  The non-moving party must set forth "specific facts" demonstrating the existence of a genuine issue for trial.  *Id.*; *Anderson*, 477 U.S. at 256.  A party cannot create a genuine issue of fact by simply contradicting his or her own previous sworn statement, *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999), or by asserting "some metaphysical doubt" as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Likewise, discrediting the testimony proffered by the moving party will not usually constitute a sufficient response to a motion for summary judgment.  *Anderson*, 477 U.S. at 256-57.

To survive a motion for summary judgment, the adverse party must present "affirmative evidence," which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn.  *Id.* at 255, 257.  When the record, however, taken as a whole, "could not lead a rational trier of fact to find for the nonmoving party," summary judgment is warranted.  *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006); *see also Beard v. Banks*, 548 U.S. 521, 126 S. Ct. 2572, 2578 (2006) ("Rule 56(c) 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial'" (quoting *Celotex*, 477 U.S. at 322)).

In this action, Jones alleges (i) discrimination on the basis of race, asserting both disparate impact and disparate treatment theories, (ii) hostile work environment, and (iii) retaliation for engaging in protected activities, all in violation of both federal and state law.  *See* Amended Complaint (docket no. 21).  Metro has moved for partial summary judgment on Jones's disparate impact claim primarily on grounds that Jones's expert, Barry Knake, is not qualified and that his opinion does not pass muster under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  Metro has separately moved for partial summary

1   judgment with regard to Jones's other claims on both statute of limitations and substantive

2   grounds.  The Court addresses Metro's motions seriatim.

3   **C.    Disparate Impact**

4          A disparate impact claim challenges a facially neutral employment practice that has a

5   significant adverse effect on a protected group and cannot be justified by business necessity.

6   _Rose v. Wells Fargo & Co._, 902 F.2d 1417, 1424 (9th Cir. 1990); _see also_ _Griggs v. Duke_

7   _Power Co._, 401 U.S. 424, 431 (1971) ("The Act proscribes not only overt discrimination but

8   also practices that are fair in form, but discriminatory in operation.  The touchstone is

9   business necessity.").  To establish a prima facie case of disparate impact, a plaintiff must

10  (i) identify the specific employment practice or selection criterion being challenged, and

11  (ii) prove causation.  _Cota v. Tucson Police Dep't_, 783 F. Supp. 458, 471 (D. Ariz. 1992);

12  _see_ _Durante v. Qualcomm, Inc._, 144 Fed. Appx. 603, 605 (9th Cir. 2005).  As to the latter

13  element, the plaintiff must provide "statistical evidence of a kind and degree sufficient to

14  show" that the challenged practice has caused a disparate impact due to membership in a

15  protected group.  _Rose_, 902 F.2d at 1424 (quoting _Watson v. Fort Worth Bank & Trust_, 487

16  U.S. 977, 994 (1988)).  The statistical disparities proffered by a plaintiff "must be

17  sufficiently substantial that they raise such an inference of causation."  _Watson_, 487 U.S. at

18  995.  A court, however, is not obliged to assume that a plaintiff's statistical evidence is

19  reliable, and an employer may "adduce countervailing evidence" of its own.  _Id._ at 996.  In

20  _Watson_, the Supreme Court identified typical examples of weaknesses in statistical evidence,

21  including "small or incomplete data sets and inadequate statistical techniques."  _Id._ at 996-

22  97.  The _Watson_ Court also noted that "[o]ther kinds of deficiencies in facially plausible

23  statistical evidence may emerge from the facts of particular cases."  _Id._ at 997.

24         If the plaintiff presents a prima facie case, the burden shifts to the employer to

25  demonstrate that "the challenged practice is job related for the position in question and

26  consistent with business necessity."  42 U.S.C. § 2000e-2(k)(1)(A)(i); _see_ _Durante_, 144 Fed.

1    Appx. at 605; _Rose_, 902 F.2d at 1424.  If the employer makes the requisite showing, the

2    burden shifts back to the plaintiff to prove that "other tests or selection devices, without a

3    similarly undesirable [discriminatory] effect, would serve the employer's legitimate interest"

4    and "would be equally as effective as the challenged practice" taking into account "[f]actors

5    such as the cost or other burdens of [the] proposed alternative selection devices."  _Watson_,

6    487 U.S. at 998; _see Rose_, 902 F.2d at 1424.

7            Metro contends that Jones has not presented a prima facie case of disparate impact for

8    two reasons:  (i) he has not identified a specific, facially neutral employment practice that

9    allegedly has a discriminatory effect, and (ii) he has not presented statistical evidence

10   sufficient to establish causation.  Metro's first assertion lacks merit, but its second argument

11   justifies dismissal of Jones's disparate impact claim.  Although disparate impact challenges

12   generally involve standardized tests or other seemingly objective selection methods that have

13   a disparate impact on a protected group, the Supreme Court has made clear that a subjective

14   or discretionary system can be subject to disparate impact scrutiny.  _Watson_, 487 U.S. at

15   998-99; _see also Rose_, 902 F.2d at 1424.  In this case, the practice Jones challenges is

16   allocating discretion to particular Metro supervisors to decide whether to grant leniency in a

17   particular case, _i.e._, suspend rather than terminate an employee found to have committed an

18   act of gross misconduct.[4]  Such system of subjective decision-making falls squarely within

19   the bounds of practices that are susceptible to a disparate impact challenge.

20           Jones, however, fails to show that disciplinary discharges meted out in such fashion

21   have produced a discriminatory effect.  Jones relies on statistical analysis performed by his

22   expert, Barry Knake.[5]  Mr. Knake's opinion, however, suffers from two fundamental flaws:

23   _____

24   [4] Jones does not appear to assert a disparate impact claim as to any of Metro's other employment practices.  In
     particular, he provides no statistical data or analysis regarding progressive discipline for Minor infractions like
     those for which he received performance reports and at least one suspension.

25

26   [5] Metro seeks essentially to exclude Mr. Knake's various declarations on grounds that Mr. Knake lacks the
     qualifications necessary to provide expert testimony on disparate impact or statistics, that he is motivated by
     personal interests, including receiving compensation on a quasi contingency-fee basis, _see_ Knake Dep. at

1   (i) he does not know how the numbers on which he relied were generated, what the numbers

2   represent, or whether the numbers are accurate; and (ii) he has not accounted for non-

3   discretionary discharges, which if based on use or possession of a controlled substance are

4   not subject to disparate impact analysis, _see_ 42 U.S.C. § 2000e-2(k)(3) ("rule barring the

5   employment of an individual who currently and knowingly uses or possesses a controlled

6   substance" does not constitute "an unlawful employment practice" unless "such rule is

7   adopted or applied with an intent to discriminate"); _Rose_, 902 F.2d at 1424 (disparate impact

8   claim does not require proof of intent).

9        Mr. Knake has performed the following calculations.  Using what he believed to be

10   the total number of terminations for the four-year period from 2003 to 2007 of non-minority

11   (25) and African-American (25) transit operators, he computed a termination rate for non-

12   minority (1.44%) and African American (3.99%) transit operators by dividing the respective

13   number of terminations by the alleged average number of non-minority (1,730.4) and

14   African-American (625.4) transit operators per day.  _See_ Knake Decl. at 11 (Fig. 1) (docket

15   no. 60).  He arrived at the average daily number of transit operators by sampling only five

16   days in an almost six-year period from the beginning of 2002 to the end of 2006.  _See_ _id._ at

17   App. I.  Using these figures, Mr. Knake concluded that the termination rate for African

18

19

20   38:16-19, Exh. 4 to Zeldenrust Decl. (docket no. 95), and that his methods are flawed.  Expert testimony is
     admissible pursuant to Fed. R. Evid. 702 if it is both relevant and reliable.  _Elsayed Mukhtar v. Cal. State_
21   _Univ., Hayward_, 299 F.3d 1053, 1063 (9th Cir. 2002), _amended by_ 319 F.3d 1073 (9th Cir. 2003).  The Court
     has an obligation to act as "gatekeeper" to exclude "junk science" and expert opinions that do not meet Rule
22   702's reliability standard.  _Id._ (citing _Kumho Tire Co. v. Carmichael_, 526 U.S. 137 (1999), and _Daubert v._
     _Merrell Dow Pharms., Inc._, 509 U.S. 579 (1993)).  In evaluating the admissibility of non-scientific expert
23   testimony, however, the Court need not apply the _Daubert_ factors (_see_ 509 U.S. at 593-94 (testing, peer review
     and publication, potential error rate, general acceptance in the relevant scientific community)), but rather may
24   consider merely the knowledge and experience of the proposed expert.  _See_ _Living Designs, Inc. v. E.I. Dupont_
     _de Nemours & Co._, 431 F.3d 353, 368 n.14 (9th Cir. 2005).  Although Metro attacks Mr. Knake's credentials
25   and ethics, its arguments go predominantly to the weight of his testimony as opposed to its admissibility.  In
     addition, because Mr. Knake has been proffered as an expert only with regard to Jones's disparate impact
26   claim, _see_ Knake Dep. at 128:10-21, Exh. 4 to Zeldenrust Decl. (docket no. 95), and because Mr. Knake's
     opinions fail to support such claim, the Court does not separately decide whether Mr. Knake is qualified to
     testify as an expert witness.

ORDER  - 14

American transit operators is 2.76 times higher than the termination rate for non-minority

transit operators.  _Id._ at Fig. 1.

---

| **Barry Knake's Calculations**: | Non-Minority | African-American |
|---|---|---|
| Aggregate Number of Terminations / 4 Years | 25 | 25 |
| Average Number of Transit Operators / Day | 1,730.4 | 625.4 |
| Termination Rate | 1.44% | 3.99% |

---

In his deposition, however, Mr. Knake indicated that he never himself examined the

raw data provided by Metro, that he relied on Judy Calhoun to summarize the data, and that

he never personally checked the validity of Ms. Calhoun's calculations or her extractions of

information.  Knake Dep. at 181:8-15, 211:1, 211:21-212: 1, 212:10-24, Exh. 4 to Zeldenrust

Decl. (docket no. 95).  In her deposition, Ms. Calhoun explained that she provides paralegal

and accounting services for Jones's attorney on a barter and volunteer basis, that she had no

discussions with Mr. Knake concerning the case (or how to perform the data manipulations

at issue) until the Friday before her deposition, which was almost a month after Mr. Knake's

declaration containing his analysis was filed with the Court, and that Jones's attorney was

the person who gave her instructions concerning which data to use and how to sort it.

Calhoun Dep. at 4:23-25, 7:22-8:11, 28:8-11, 28:24-29:3, Exh. 5 to Zeldenrust Decl. (docket

no. 95).  Prior to her deposition, Ms. Calhoun signed a declaration prepared by Jones's

attorney indicating that, using the Microsoft Excel program, she sorted by job title, race, and

reason for separation information provided by Metro, and that the results of her efforts, two

spreadsheet pages attached to her declaration, showed 25 disciplinary discharges respectively

for white and black transit operators for the period from 2004 to 2007.  Calhoun Decl. at 2

(docket no. 62); _see_ Calhoun Dep. at 23:23-24, Exh. 5 to Zeldenrust Decl. (indicating that

John Scannell prepared the declaration).  At the time of her deposition, however,

Ms. Calhoun could not provide any specific information concerning how she arrived at the

ORDER  - 15

1    figures of 25 terminations respectively for white and black transit operators.[6]  Calhoun Dep.

2    at 43:8-11, 45:11-25, Exh. 5 to Zeldenrust Decl.

3           An obvious discrepancy between Mr. Knake's analysis and Ms. Calhoun's data is the

4    time period at issue; Mr. Knake recites a four-year period from 2003 to 2007, while

5    Ms. Calhoun describes a three-year period from 2004 to 2007.  An additional error was

6    introduced when, to calculate the average number of transit operators per day, Mr. Knake

7    used data from 2002, which is outside either of the periods in question.[7]  The fatal flaw in

8    Mr. Knake's calculations, however, is evidenced in the spreadsheets generated by

9    Ms. Calhoun, which show only the description "discharge," without any further clarification.

10   _See_ Exh. to Calhoun Decl. (docket no. 62-4).  Neither Mr. Knake nor Ms. Calhoun have

11   explained or been able to explain whether the tabulated discharges are discretionary or non-

12   discretionary or whether any of the discharges were based on Metro's anti-drug policy,

13   terminations under which are not subject to a disparate impact challenge.[8]  In sum,

14   Mr. Knake's statistical analysis fails to take into account crucial information, while relying

15   on suspect data that was generated by a person he did not adequately instruct or supervise

16   and that he cannot sufficiently explain.  Mr. Knake has abdicated his responsibility to

17   evaluate the relevant data and, as a result, the statistical analysis proffered by Jones is

18

19   [6] Ms. Calhoun's recently filed declaration indicates that, of the 25 black employees terminated during the period
20   for which she tabulated data, one was returned to work through the union grievance process, while no white
     employees were likewise successful.  Calhoun Decl. (docket no. 165).

21   [7] Metro's expert, Peter Nickerson, has identified other problems with Mr. Knake's computations.  First,
22   Mr. Knake committed a fundamental statistical error by comparing an aggregate or group (total terminations
     over four years) to an average (average number of operators per day).  Nickerson Decl. at ¶ 7 (docket no. 90).
23   Second, Mr. Knake probably underestimated the population of transit operators by using averages that do not
     count the employees who were terminated in each year.  _Id._  Finally, Mr. Knake relied on figures that are
24   inconsistent with Metro's records.  Unlike Mr. Knake, Mr. Nickerson personally examined the log of
     disciplinary actions for Metro transit operators from 1997 through 2007.  _Id._ at ¶ 6.  Based on his review of
25   Metro's records, Mr. Nickerson has averred that, for the period from 2003 to 2007, the number of discharges
     was over 150, which is triple the amount used in Mr. Knake's analysis.  _Id._

26   [8] In fact, in general, 70% to 85% of all of Metro's disciplinary terminations are for non-discretionary reasons.
     Cusack Decl. at ¶ 9 (docket no. 130).

ORDER  - 16

unreliable and does not raise the requisite inferences that African-American transit operators are discretionarily terminated at a higher rate than non-minority transit operators or that any such disparate impact is related to membership in a protected class.[9]   The Court therefore concludes that Jones has failed to present a prima facie case of disparate impact.  As a result, the Court need not consider whether discretionary discharge for gross misconduct is based on a criterion that is "job related for the position in question and consistent with business necessity" or whether Jones's proposed alternative termination procedures would adequately serve Metro's needs without causing a discriminatory impact.[10]   The Court GRANTS partial summary judgment in favor of Metro and DISMISSES with prejudice Jones's disparate

---

[9] Jones's reliance on the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R §§ 1607.1 - 1607.16 (the "Guidelines"), is misplaced.  Although the Guidelines articulate record-keeping and validity standards, 26 C.F.R. §§ 1607.4 & 1607.5, they do so only with regard to "selection procedures," 29 C.F.R. § 1607.2(C), which are defined as a "measure, combination of measures, or procedure used as a basis for any employment decision," including "assessment techniques from traditional paper and pencil tests, performance tests, training programs, or probationary periods and physical, educational, and work experience requirements through informal or casual interviews and unscored application forms," 29 C.F.R. § 1607.16(Q).  The Guidelines do not relate to the type of "for cause" discharge at issue in this case.  Moreover, the Guidelines were not promulgated as regulations and do not have the force of law.  *Clady v. County of Los Angeles*, 770 F.2d 1421, 1428 (9th Cir. 1985).  The Court declines to draw from the absence of records or validity studies described in the Guidelines any inferences adverse to Metro.  *See Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1287 n.13 (5th Cir. 1994).

[10] Attached to one of Mr. Knake's declarations are copies of (i) a paper he presented in 1992 titled "Toward Professional Law Enforcement" and (ii) a report he authored in 1981 titled "Job Analysis and Test Development: The Job Element Method in Theory and Practice."  *See* Knake Decl. (docket no. 121); *see also* Knake Amended Decl. (docket no. 166) (attaching two copies of the latter document).  Both the 1992 paper and the 1981 report purport to describe an objective, non-discriminatory method for distinguishing between "superior," "barely acceptable," and potentially problematic employees.  The theory underlying Mr. Knake's work seems fairly obvious:  by identifying the characteristics of a well-performing employee, an organization can design tests or other measures that screen for such attributes in candidates.  Mr. Knake proposes to extend this concept relating to the selection of employees to the realm of terminations.  *See* Knake Dep. at 41:8-14, Exh. 4 to Zeldenrust Decl. (docket no. 95) ("[a]ny employment decision [including termination] is a selection procedure").  When applied to discharges, however, Mr. Knake's job-element method does not offer a meaningful alternative to the process Metro currently uses; Metro defines gross misconduct as a trait not desired in its employees and it already weighs such misbehavior against other factors, like past performance and acceptance of responsibility, in deciding whether a sanction less than termination is warranted.  *See* Cusack Decl. at ¶¶ 4 & 5 (docket no. 99); *compare* Knake Dep. at 179:13-17, Exh. 4 to Zeldenrust Decl. (conceding that, in some circumstances, assault of a co-worker can be a legitimate reason for firing an employee).  Thus, even if the Court were to reach the third prong of the disparate impact analysis, the result would be the same.

ORDER - 17

1   impact claim under both federal and state law.  The Court also GRANTS Metro's motion in

2   limine to exclude the testimony of Barry Knake, and RENOTES Metro's remaining motions

3   in limine, docket no. 134, to the date of the Pretrial Conference, September 3, 2008.  Counsel

4   shall be prepared to address at the Pretrial Conference all motions in limine pending at that

5   time.

6   **D.      Statute of Limitations and Hostile Work Environment**

7           Metro contends that some of Jones's claims are barred by the applicable statutes of

8   limitations.  Jones concedes that some of his claims are outside the limitations period, but he

9   argues that he should be allowed "to demonstrate a pattern of 10-30 years of discrimination."

10  Response at 6 (docket no. 142).  The Court construes Jones's contention as asserting a

11  "continuing violation" or hostile work environment theory for analyzing the effect of any

12  statutes of limitations.  Under such reasoning, all acts contributing to the alleged hostile work

13  environment are treated as one unlawful employment practice, and a plaintiff's claim is

14  timely filed as long as one of the acts at issue occurred during the limitations period.  *Nat'l*

15  *R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117-18 (2002); *Antonius v. King County*,

16  153 Wn.2d 256, 264-66, 103 P.3d 729 (2004).  To constitute one actionable unlawful

17  employment practice, however, the various acts "must have some relationship to each other."

18  *Antonius*, 153 Wn.2d at 271 (citing *Morgan*, 536 U.S. at 118).  Intervention by an employer

19  can destroy the connection between earlier and later acts.  *See Morgan*, 536 U.S. at 118;

20  *Antonius*, 153 Wn.2d at 271.  Moreover, discrete acts, such as termination, suspension,

21  failure to promote, denial of transfer, or refusal to hire, cannot qualify as related acts, and

22  therefore, are not cognizable unless they themselves occur within the limitations period.

23  *Morgan*, 536 U.S. at 108-13; *Antonius*, 153 Wn.2d at 264.

24          The statute of limitations for claims brought under the Washington Law Against

25  Discrimination ("WLAD") is three years.  *Antonius*, 153 Wn.2d at 261-62; *see* RCW

26  4.16.080(2) (action for personal injury must be commenced within three years).  The statute

of limitations is tolled during the sixty-day period of mandatory presentment to a governmental entity. *See* RCW 4.96.020(4). Jones filed this action in King County Superior Court on January 22, 2007. Thus, the relevant date for purposes of the statute of limitations analysis concerning Jones's state law claims is November 23, 2003.

Under Title VII of the Civil Rights Act, a plaintiff must file a complaint with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged incident. 42 U.S.C. § 2000e-5(e)(1). Although Jones alleges that he filed an EEOC complaint on December 30, 2005, *see* Amended Complaint at ¶ 16 (docket no. 21), he provided no evidence of such complaint, which presumably related to his two-day suspension due to Supervisor Brumbach's report of Jones arriving at a stop 2½ minutes early. Metro, however, has assumed for purposes of argument that December 30, 2005, is the appropriate date for computing the limitations period for Jones's Title VII claim, making the relevant date March 5, 2005.[11] As to Jones's claim under 42 U.S.C. § 1981, the statute of limitations is four years, *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004); *see* 28 U.S.C. § 1658, and the relevant date is January 22, 2003.

Based on these statutes of limitations dates, the following claims are barred[12] either as discrete acts occurring before the applicable date or as non-discrete acts unrelated to acts that are both within the limitations period and eligible for consideration in a hostile work environment claim:

- Title VII claim based on Metro's decision imposing no discipline and counseling Brice against the use of the term "boy" (December 2000);

- Title VII claim based on Metro's decision imposing no discipline for an alleged shove and reminding Jones and Brice not to have contact (circa April 2002);

---

[11] Metro indicates that the relevant date for Jones's Title VII claim is February 24, 2005. *See* Metro's Second Motion at 7 (docket no. 105). February 24, 2005, however, is 309 days before December 30, 2005, excluding the end date.

[12] Metro's decisions in January 2003 and February 2007, respectively, not to impose discipline on Jones in connection with the complaints of a juvenile customer and of co-worker Jensen do not constitute adverse employment actions and therefore are not cognizable under federal or state law.

- Title VII, Section 1981, and WLAD claims for Metro's decision counseling a mechanic against the use of a racial slur and documenting the incident in the mechanic's file (July 2002);

- Title VII, Section 1981, and WLAD claims for Metro's decision suspending Jones for five days based on a positive urinalysis (September 2002);

- Title VII claim based on the chalking of Jones's vehicle tires (Dec. 2003);

- Title VII claim based on the splitting of Jones's shift (September 2004); and

- Title VII claim based on Metro's decision imposing no discipline for a December 2004 incident and reminding Jones and Brice not to have contact (February 2005).

The Court GRANTS partial summary judgment in favor of Metro and DISMISSES the above-enumerated claims with prejudice.  Thus, under Title VII, Jones's only claims not barred by the statute of limitations are for disparate treatment or retaliation based on the three performance reports issued between April 2005 and March 2006, the requested police response to the collision occurring in December 2006,[13] and his suspension and termination in June 2007.  Under the WLAD and 42 U.S.C. § 1981,[14] additional Metro actions/inactions relating to Jones's disparate treatment and retaliation claims are within the limitations period. In addition, the various decisions concerning incidents involving Jones and Deborah Brice are not barred because they are related, with the most recent one occurring during the WLAD and Section 1981 limitations periods.

Although Jones's hostile work environment claims under the WLAD and Section 1981 survive the statute of limitations gauntlet, the Court nevertheless dismisses the

---

[13] The requested police response does not alone support a hostile work environment claim, and it may not be aggregated with the various discrete acts to form such claim.  Thus, under Title VII, the only claims surviving the statute of limitations analysis are disparate treatment and retaliation as to the employment actions described above.

[14] The Supreme Court has recently expanded the scope of claims cognizable under Section 1981.  See CBOCS West, Inc. v. Humphries, 128 S. Ct. 1951 (2008) (retaliation claims may be brought under Section 1981 if the alleged retaliation was for activities taken on behalf of a person discriminated against on the basis of race). Meanwhile, the Ninth Circuit has recently reiterated the expansive construction it has given Section 1981. Johnson v. Riverside Healthcare Sys., LP, 516 F.3d 759 (9th Cir. 2008) (hostile work environment claims are cognizable under Section 1981 if related to race or ethnicity).

ORDER  - 20

1    claims as lacking in merit as a matter of law.  Under the WLAD, to establish a claim for

2    hostile work environment, a plaintiff must prove that the harassment (i) was unwelcome,

3    (ii) was due to membership in a protected class, (iii) affected the terms and conditions of

4    employment, and (iv) was imputable to the employer.  _Clarke v. Office of the Attorney Gen._,

5    133 Wn. App. 767, 785, 138 P.3d 144 (2006).  To satisfy the third element, the harassment

6    must be "sufficiently pervasive so as to alter [his or] her employment conditions" and the

7    conduct must be more than "merely offensive."  _Id._  "The conduct must be both objectively

8    abusive (reasonable person test) and subjectively perceived as abusive by the victim."

9    _Adams v. Able Bldg. Supply, Inc._, 114 Wn. App. 291, 297, 57 P.3d 280 (2002).  Moreover,

10   with respect to the fourth element, before a non-supervisory employee's actions can be

11   imputed to the employer, a plaintiff must demonstrate that the employer (1) authorized,

12   knew, or should have known of the harassment, and (2) failed to take reasonably prompt and

13   adequate corrective action.  _Washington v. Boeing Co._, 105 Wn. App. 1, 11, 19 P.3d 1041

14   (2000); _compare_ _Sangster v. Albertson's, Inc._, 99 Wn. App. 156, 164-65, 991 P.2d 674

15   (2000) (observing that, when a supervisor is alleged to have created a hostile work

16   environment, an employer may raise an affirmative defense requiring proof that the employer

17   exercised reasonable care to prevent and promptly correct harassing behavior and the

18   plaintiff unreasonably failed to take advantage of such preventive or corrective

19   opportunities).

20        The standard under Section 1981 is similar.  To present a prima facie hostile work

21   environment claim under Section 1981, a plaintiff must show that (i) he or she was subjected

22   to verbal or physical conduct because of his or her race, (ii) the conduct was unwelcome, and

23   (iii) the conduct was sufficiently severe or pervasive to alter the conditions of his or her

24   employment and create an abusive work environment.  _Johnson v. Riverside Healthcare Sys.,_

25   _LP_, 516 F.3d 759, 764 (9th Cir. 2008).  The work environment "must be perceived as

26   abusive from both a subjective and objective point of view."  _Id._  In assessing whether the

ORDER  - 21

conduct satisfies the prima facie threshold for being sufficiently severe or pervasive, the Court should consider "all the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)).

With respect to the various decisions concerning incidents involving Jones and Deborah Brice, which are the only actions within the limitations period for a hostile work environment claim under the WLAD, and which are also cognizable under Section 1981 to the extent they involve allegations of racial harassment, Jones simply cannot meet the "objectively abusive" standard.  At most, Jones might establish that Ms. Brice used the derogatory term "boy," which does not rise above the level of "merely offensive," and which, in context, might be viewed more as a comment on Jones's child-like behavior than as a racial slur.  With respect to Jones's allegation that Ms. Brice shoved him in April 2002, Jones fails to present any evidence that such disputed touching was motivated by Jones's membership in a protected class, and with respect to Jones's allegation that Ms. Brice sexually harassed him in December 23, 2004, Jones fails to present any evidence at all. Moreover, as to both the April 2002 and December 2004 incidents, Jones fails to proffer any evidence that Metro's response was other than reasonably prompt and adequately corrective. Thus, the incidents involving Ms. Brice do not support a hostile work environment claim under the WLAD or Section 1981.

The only other possible grounds for a hostile work environment claim under Section 1981 are the chalking of Jones's vehicle tires, the splitting of Jones's shift on one particular day in September 2004, and the request for SPD assistance after Jones's collision in December 2006.  Jones, however, provides no evidence that any of these activities were due to race.  Indeed, Supervisor Watkins's undisputed declaration indicates that, when he chalked the tires at issue, he had no knowledge that the vehicle belonged to Jones.  Likewise,

Supervisor Craig's undisputed declaration indicates that, when he contacted SPD in connection with the collision at issue, he did not recall Jones from his two brief contacts with him five and three years earlier, respectively.  Moreover, even if Jones could demonstrate a nexus between his race and the incidents at issue, he cannot by any stretch of the imagination satisfy the "objectively abusive" test; he cannot even show that a reasonable person would find offensive, let alone abusive, the chalking of his tires, the failed attempt to maximize his working hours, or the call for police response to the scene of his collision.  Thus, the Court GRANTS partial summary judgment in favor of Metro and DISMISSES with prejudice Jones's hostile work environment claims under both federal and state law.

**E.      Disparate Treatment and Retaliation**

Under Title VII, Section 1981, and the WLAD, in the absence of direct evidence of discrimination or retaliation, courts employ the three-part burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008) ("Typically, we apply the familiar *McDonnell Douglas* burden shifting framework for Title VII and § 1981 claims.  A plaintiff may alternatively proceed by simply producing 'direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the employer.'" (citations omitted)); *Hines v. Todd Pac. Shipyards Corp.*, 127 Wash. App. 356, 370-71, 112 P.3d 522 (2005) ("Washington courts have adopted the *McDonnell Douglas/Burdine* three-part burden allocation framework for disparate treatment cases." (citing *McDonnell Douglas* and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981))); *see also Tyner v. Dep't of Soc. & Health Servs.*, 137 Wn. App. 545, 564, 154 P.3d 920 (2007) (the *McDonnell Douglas/Burdine* "burden shifting scheme also applies to retaliation claims").

To present a prima facie case of disparate treatment, a plaintiff must prove that (i) he or she is a member of a protected class, (ii) he or she was treated less favorably than a similarly situated non-protected employee, and (iii) the non-protected employee was doing

1   the same work.  *See* *Clarke v. Office of the Attorney Gen.*, 133 Wn. App. 767, 788-89, 138

2   P.3d 144 (2006); *compare* *Surrell*, 518 F.3d at 1105-06 (describing the elements of a prima

3   facie case under Title VII and § 1981 for discriminatory failure to hire or promote, which

4   include that the plaintiff applied for a job for which he or she was qualified and that the

5   plaintiff was rejected).  To make out a prima facie case of retaliation, a plaintiff must

6   establish that (i) he or she engaged in statutorily protected activity, (ii) the employer took

7   some adverse action against him or her, and (iii) a causal link exists between the protected

8   activity and the adverse action.  *See* *Surrell*, 518 F.3d at 1108; *Tyner*, 137 Wn. App. at 563.

9        Only if a plaintiff presents sufficient evidence of a prima facie case does the burden

10   shift to the employer to provide evidence of legitimate, nondiscriminatory reasons for its

11   actions.  *See* *Surrell*, 518 F.3d at 1106, 1108; *Tyner*, 137 Wn. App. at 563-64; *see also*

12   *Hines*, 127 Wn. App. at 371.  The final burden rests on the plaintiff to produce evidence that

13   the asserted reasons are merely a pretext for discrimination and/or retaliation.  *See* *Surrell*,

14   518 F.3d at 1106, 1108; *Hines*, 127 Wn. App. at 371.

15        To establish pretext, the plaintiff must put forward specific evidence indicating that

16   the articulated nondiscriminatory reasons are "unworthy of belief."  *Hines*, 127 Wn. App. at

17   372; *see* *Lindahl v. Air France*, 930 F.2d 1434, 1437-38 (9th Cir. 1991) ("We have made

18   clear that a plaintiff cannot defeat summary judgment simply by making out a prima facie

19   case. . . .  '[T]he defendant's articulation of a legitimate nondiscriminatory reason serves . . .

20   to shift the burden back to the plaintiff to raise a genuine factual question as to whether the

21   proffered reason is pretextual.'. . . [The plaintiff] must produce specific facts either directly

22   evidencing a discriminatory motive or showing that the employer's explanation is not

23   credible.").  "Speculation and belief are insufficient to create a fact issue as to pretext.  Nor

24   can pretext be established by merely conclusory statements of a plaintiff who feels that he

25   has been discriminated against."  *Hines*, 127 Wn. App. at 372 (quoting *McKey v. Occidental*

26   *Chem. Corp.*, 956 F. Supp. 1313, 1319 (S.D. Tex. 1997)).  Moreover, summary judgment

1    may be granted in favor of an employer even when the employee has created a weak issue of

2    fact concerning pretext, if abundant, uncontroverted, independent evidence indicates that no

3    discrimination or retaliation occurred.  _See_ _Reeves v. Sanderson Plumbing Prods., Inc._, 530

4    U.S. 133, 148 (2000); _see also_ _Tyner_, 137 Wn. App. at 564.

5            With regard to the various employment actions other than suspension and termination,

6    Jones fails to present a prima facie case.  He offers no evidence that non-protected

7    employees were treated more favorably with respect to (i) Minor infractions like arriving

8    ahead of schedule, displaying an incorrect sign, and pushing a passenger, (ii) collisions

9    occurring when the transit operator did not have an "accident kit," (iii) vehicles parked in a

10   Metro lot overnight, or (iv) assignment of work to avoid the splitting of a shift.  Indeed,

11   plaintiff does not dispute that the discipline for Minor infractions is imposed in a

12   progressive, non-discretionary manner pursuant to a collective bargaining agreement, he

13   presents no evidence to support a contention that dispatch personnel or those patrolling

14   Metro's parking lots necessarily know the race or protected activities of the transit operator

15   or vehicle owner at issue, and he does not dispute that the union successfully grieved the

16   shift-splitting issue, recovering full compensation for him.  Thus, the Court GRANTS partial

17   summary judgment in favor of Metro and DISMISSES with prejudice all disparate treatment

18   and retaliation claims under federal and state law other than those relating to Jones's thirty-

19   day suspension and termination.[15]

20          With regard to the suspension and termination, the Court concludes that genuine

21   issues of material fact preclude summary judgment.  Jones presents as a comparator a fellow

22

23   [15] Jones's assertion that he was discouraged from applying for a promotion due to racial discrimination likewise
     fails to establish a prima facie case. Jones presents no direct evidence of discriminatory animus.  The most he

24   says is that Base Chief Abdu Aldina advised him to wait to apply for the position of first line supervisor
     because he "might have a better chance later on, when other managers became involved in the promotion."

25   Jones Decl. at 3 (docket no. 119).  Jones's contention that Base Chief Aldina's guidance stemmed from racial
     discrimination, _see_ _id._, is pure speculation.  Moreover, because Jones never applied for a promotion and was

26   never rejected in favor of a non-protected employee, he cannot establish a prima facie case under the
     _McDonnell Douglas_ burden-shifting framework.  _See_ _Surrell_, 518 F.3d at 1105-06.

ORDER  - 25

1   transit operator named Richard Hanson, who is Caucasian.[16]  *See* McInnis Decl. (docket

2   no. 138).  In September 2007, Mr. Hanson assaulted a female transit operator, Elaine

3   Monzon, hitting her on the left side of her upper body and knocking her off her feet.

4   Monzon Dep. at 4:25-5:11, Exh. B to Teply Decl. (docket no. 150).  When Ms. Monzon

5   looked up, Mr. Hanson was standing over her, chuckling.  *Id.* at 5:12-13.  Ms. Monzon

6   reported the assault to Metro management.  *Id.* at 6:5-7.  At a subsequent meeting involving

7   *inter alia* Ms. Monzon, Mr. Hanson, and Base Chiefs Dareyl Plummer and Pam Davis,

8   Mr. Hanson acknowledged hitting Ms. Monzon, indicated that "he was wrong for doing it,"

9   and apologized.  *Id.* at 10:15-22.  Mr. Hanson was apparently not terminated for his gross

10  misconduct; whether he received any discipline remains unclear.  In light of these facts,

11  Jones has presented a triable issue concerning whether Metro's decision not to grant leniency

12  and impose discipline less severe than termination was based on discriminatory or retaliatory

13  animus.  The Court therefore DENIES Metro's motion for partial summary judgment with

14  respect to Jones's claims under federal and state law for disparate treatment and retaliation

15  relating to his thirty-day suspension and termination.

16      IT IS SO ORDERED.

17      DATED this 9th day of July, 2008.

18

19                              Thomas S. Zilly
                                United States District Judge

20

21

---

22  [16] Plaintiff suggests that Ms. Beatty, the victim of his alleged assault, is also a comparator.  Ms. Beatty was

23  involved in an incident with a twelve-year-old passenger, during which she exited the bus she was operating and grabbed his backpack, resulting in damage to the juvenile's backpack and shirt, as well as injury to the juvenile's side.  Exh. F to Scannell Decl. (docket no. 124-7).  Ms. Beatty was suspended for thirty days and

24  then terminated, *see id.*, but she subsequently returned to work, presumably through the union grievance

25  process.  *See* Reply at 11 (docket no. 144); *compare* Cusack Decl. at ¶ 6 (docket no. 99) ("After a transit operator has been terminated, he or she may be returned to work through the grievance or review process and/or via an arbitrator's ruling.").  Jones offers no evidence that he participated in the union grievance

26  process following his suspension and termination, and therefore, Ms. Beatty's situation is not sufficiently analogous.

ORDER  - 26